[Cite as *State v. DeRemer*, 2018-Ohio-3931.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | | |
|---|---|---|
| STATE OF OHIO | | C.A. No. 28692 |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| CHARLES T. DEREMER | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR-2016-05-1717 |

DECISION AND JOURNAL ENTRY

Dated: September 28, 2018

SCHAFER, Presiding Judge.

**{¶1}** Appellant-Defendant, Charles DeRemer appeals his conviction of grand theft in the Summit County Court of Common Pleas. For the reasons that follow, we affirm in part and reverse in part.

I.

**{¶2}** DeRemer worked as an independent contract courier for EZ Delivery, a company in the business of delivering marketing materials known as "red bags" for the law firm of Kisling, Nestico and Redick (KNR). EZ Delivery paid DeRemer four dollars for every bag delivered. In turn, EZ Delivery would charge KNR five dollars or seven dollars per delivery depending on the time of day the delivery was made. KNR and EZ Delivery ultimately discovered numerous discrepancies over several months in the number of bag deliveries DeRemer claimed to have made compared with the number of bags that should have been delivered.

{¶3} The Summit County Grand Jury subsequently indicted DeRemer on one count of grand theft in violation of R.C. 2913.02(A)(3), a felony of the fourth degree. Following a trial, the jury found DeRemer guilty and the trial court sentenced DeRemer according to law.

{¶4} DeRemer filed this timely appeal, raising five assignments of error for our review.

II.

**Assignment of Error I**

**The trial court committed reversible error when it found Mr. DeRemer guilty because the evidence was insufficient to support such findings.**

{¶5} In his first assignment of error, DeRemer contends that his conviction for grand theft was based on insufficient evidence. We disagree.

{¶6} A challenge to the sufficiency of the evidence to support a criminal conviction presents a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Upon review, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Although we conduct the review de novo, "we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570, C-120751, 2013-Ohio-4775, ¶ 33.

{¶7} This matter implicates DeRemer's conviction for grand theft. The essential elements of theft as stated in R.C. 2913.02(A)(3) are as follows: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [b]y deception." Additionally, "[i]f the value of the property or services stolen is seven thousand five hundred dollars or more and is less than one hundred fifty

thousand dollars, a violation of this section is grand theft, a felony of the fourth degree." R.C. 2913.02(B)(2).

{¶8} Michael Simpson, Alin Mazilu, Scott Ruhl, Michelle Blain, Krystal Hoisington, Julie Branch, Detective David Zampelli of the Fairlawn Police Department, and Holly Tusko all testified on behalf of the State. Mr. Simpson testified that he owns and operates EZ Delivery, a company in the business of delivering bags of marketing materials for the personal injury law firm of KNR to individuals involved in car accidents. KNR paid EZ Delivery $5 for every bag delivered in the morning and $7 for every bag it delivered in the afternoon. EZ Delivery employed several independent contract couriers to make deliveries. Mr. Simpson stated that he hired DeRemer, his long-time friend, to be one of EZ Delivery's couriers. At the times relevant to this case, DeRemer was responsible for making deliveries in Akron and Summit County and was paid $4 per bag delivered.

{¶9} Mr. Simpson further testified that KNR used a computer program, Argo, to scrape names and addresses from publicly available police reports to identify potential clients. The addresses would then be uploaded into a routing program and app, Route4Me, to determine the most cost effective route for delivery. The routes were generally available between 10a.m. and 11a.m daily. However, DeRemer would typically not pick-up his morning deliveries until noon and his afternoon deliveries until 3p.m. or 3:30p.m. Mr. Simpson testified that it was common for DeRemer to postpone delivering some of the morning deliveries to the afternoon in an effort to save time if they were located on the outskirts of the county.

{¶10} The couriers, also known as "drivers", were responsible for sending an invoice to EZ Delivery every two weeks with their morning and afternoon bag delivery totals. DeRemer would submit invoices for his Summit County and Akron routes, often via picture message. Mr.

Simpson testified that he did not specifically check or compare DeRemer's invoices to anything. Rather, Mr. Simpson would only "spot check" the courier's GPS locations through the Route4Me app. Mr. Simpson stated that his sister and employee, Michelle Blain, would then create an invoice combining the numbers submitted by the couriers and Mr. Simpson would submit the final invoice to KNR for payment. Mr. Simpson testified that as far as he knew, someone at KNR was reviewing the invoices because he was getting paid.

{¶11} However, Mr. Simpson was eventually contacted by Holly Tusko, a KNR employee, in February 2016 concerning an invoice that was not being paid because the bag delivery numbers did not match the numbers generated by Argo. Mr. Simpson stated that he was shocked that the numbers did not match. He testified that he was able that evening to compare the EZ Delivery invoice he had submitted to KNR to the routes created through Route4Me and see that none of the numbers were correct for the Akron and Summit County territories. Mr. Simpson stated he spoke to DeRemer that night and that DeRemer stated he may have turned in the invoice from the week or month before. However, Mr. Simpson further testified, that he met with Ms. Tusko and they were able to compare all of EZ Delivery's invoices back to March 2015 and determine that none of the numbers for the Akron or Summit County routes matched the numbers generated by Argo. Nonetheless, when they checked the numbers for the Stark, Youngstown, and Cincinnati drivers' territories, "[e]verything was fine." Mr. Simpson stated that he did not inflate the numbers, rather, "the exact numbers that [were] on [DeRemer]'s sheets were the exact numbers that [he] turned in to KNR."

{¶12} Mr. Simpson testified that as a result of the inflated numbers he had to pay KNR back more than $43,000.00. In order to accomplish this, Mr. Simpson stated that EZ Delivery basically did business with KNR for six weeks without being paid in order to accomplish the pay

back. He further stated that in order to pay the EZ Delivery drivers, he was forced to deplete his personal savings.

{¶13} Mr. Simpson also testified that although he asked DeRemer to come in and speak with him about the invoicing issues, the two never spoke face-to-face. DeRemer did not come back to work after being confronted with the bag delivery number discrepancies.

{¶14} Mr. Mazilu testified that he designs software for clients through his company, SKE GlobalTech. He stated that he designed Argo for KNR to scrape police report data from different sources and centralize it into one database that KNR could use for marketing purposes. Mazilu further testified that when Argo retrieves the information, it compares it to the existing database and disregards any duplicate information. Mazilu stated that although users can input additional names and addresses, the user interface does not allow users to alter, delete, or duplicate the names and addresses Argo scrapes itself. Additionally, Mazilu stated that the bulk of the information in the database comes from the Ohio Department of Safety and not from manual insertions. Mazilu then described the process for extracting the data from Argo for a specific region and importing that information into the Route4Me program in order to map the most efficient route to deliver the entire list. Mazilu testified that other than normal maintenance issues, he has not had any "problems" with Argo nor has Argo ever been "compromised".

{¶15} Scott Ruhl testified that he is the Lead Data Specialist at KNR and that he oversees the Data Department. He stated that he is responsible for "making sure that all the prints for the labels for mailers get out on time to different offices", overseeing the red bag deliveries, and communicating with the different courier services. He explained his process for preparing the routes for the couriers as follows:

> I would create a sheet of labels and put them on mailers, and then I would put
> those mailers in the red bags, and then I would go through the routing program,

Route4Me, and what it did is it took a spreadsheet and it collaborated all the addresses; so, put them in the best order to deliver them in, starting with [KNR's] address first, and it was just to, you know, save time.

And then I would stack them all up and have them ready for whoever picked them up.

Mr. Ruhl further testified that Argo then generated the spreadsheet used to create the address labels and to upload the addresses into the Route4Me program and that he printed the spreadsheet twice a day. The spreadsheet was then saved to a shared file and timestamped. Mr. Ruhl also stated that the spreadsheet could not be manipulated, however, if after being uploaded into Route4Me, an address was determined by the program to not be valid, after attempting to validate an address, Mr. Ruhl would delete any invalid addresses from the list and they would not appear on the final route. Additionally, if multiple people lived at the same address, Mr. Ruhl stated that only one bag would be delivered with all of the individuals' address labels attached to the same bag.

{¶16} Mr. Ruhl testified that he would prepare DeRemer's routes by uploading the spreadsheet created by Argo to Route4Me and then emailing the optimized route to DeRemer. Mr. Ruhl would then copy and paste the route into a Word document and save a timestamped copy. The State admitted as evidence, copies of Word documents. Mr. Ruhl stated he did not alter the copies, except to add the information from the timestamp. He further stated that, to his knowledge, DeRemer understood that when multiple individuals lived at one address and all of the address labels were attached to one bag, only the one bag was to be delivered. Mr. Ruhl stated that DeRemer typically picked up his morning routes between 10:45 a.m. and 11:30 a.m. Mr. Ruhl stated that most days DeRemer did not finish all of the deliveries on the morning route before picking up his afternoon route. In those situations, Mr. Ruhl would then put the

undelivered addresses on DeRemer's afternoon route. Mr. Ruhl did not do this for other couriers.

{¶17} Ms. Blain testified that she worked for her brother's companies, MRS Investigations and EZ Delivery from late Summer 2014 until February 2016. She stated that in addition to doing payroll for the companies, she put together the routes for the local drivers, "got the Route4Me program up and running, taught the drivers how to use them, [ and] monitored daily their routes * * *." She stated that after Mr. Ruhl uploaded the routes to Route4Me, she would be able to see how many deliveries there were, where the courier currently was, and what time the courier started and stopped. She also printed a hardcopy of the delivery route for the local drivers. She stated that if multiple people lived at the same address, the address would only be listed on the route once and a single bag would be delivered with individual labels for each person attached. Ms. Blain testified that DeRemer was the person who trained her to assemble the red bags for delivery and specifically showed her how to do the labels when there were multiple labels to be put on an individual bag. She further stated that she monitored the drivers in Toledo and Cincinnati on a daily basis to ensure that the deliveries were being made since they did not have contact with those drivers. She stated she was able to do this through the Route4Me app.

{¶18} Ms. Blain also stated that she did not monitor the local drivers since Mr. Simpson trusted DeRemer and did not have a concern about DeRemer since there was never an issue of bags not being delivered. Ms. Blain did, however, state that DeRemer would typically leave bags from his morning route to be added to his afternoon route. When this happened, Ms. Blain would send the address to KNR to be included in the afternoon route. However, if that address was left out of the afternoon route, Ms. Blain would handwrite where in the afternoon route that

undelivered morning delivery should be made.  Ms. Blain stated this happened less than twenty times in the year and a half she was assembling the deliveries for EZ Delivery.

{¶19}  In reference to her payroll responsibilities, Ms. Blain testified that she did payroll every two weeks.  She stated that every two weeks the drivers would send her their bag counts for the morning and afternoon deliveries.  Ms. Blain would then compile those numbers into a spreadsheet and turn it into Mr. Simpson.  Although Ms. Blain stated that there was not a standard way for the drivers to submit their numbers, all of the drivers with the exception of DeRemer emailed, while DeRemer usually "just took a picture of the handwritten one he had at home and sent it to [her] via text."  The State admitted as evidence images Ms. Blain identified as the texts she received from DeRemer for payroll purposes.  Ms. Blain explained that the sheets submitted by DeRemer were broken down by the week, the day, and then by the morning and afternoon delivery count and also provided a total number of deliveries made per day.  Although Ms. Blain stated that she would "spot check" the other drivers per instruction from Mr. Simpson, she did not check if DeRemer's numbers were correct since Mr. Simpson told her "he wasn't worried about [DeRemer]."  Ms. Blain testified that she then entered the numbers from the sheets submitted by DeRemer into the final invoice to be submitted to Mr. Simpson who would in turn submit it to KNR.  Ms. Blain stated she was not aware of any issues with DeRemer's invoices until March or April 2016, after she had stopped working for EZ Delivery.

{¶20}  Ms. Branch testified that she is a bookkeeper at KNR.  She stated that her responsibilities include taking "care of the day-to-day accounting office tasks, such as paying bills and depositing all of the income, as well as some reimbursement checks to the firm."  Additionally, Ms. Branch does the monthly financial statements and helps the paralegals and other staff with settlement memos for clients.  Ms. Branch stated that she receives invoices from

EZ Delivery every two weeks and that those invoices required approval from Ms. Hoisington in order to be paid. However, Ms. Branch also stated that there were times she would pay the invoices without Ms. Hoisington's approval so the bills would be paid in a timely manner. Nonetheless, Ms. Branch never reviewed EZ Delivery's invoices for accuracy as it was not part of her job. In order to pay the invoices, Ms. Branch would enter a check to be paid and after it printed, she would give them to Rob Nestico to be signed. After the check was signed, Mr. Simpson would be able to pick up the check.

{¶21} Ms. Hoisington testified that before being terminated from KNR she held several positions, including Data Supervisor and New Client Administrator. She stated that when she was the Data Supervisor she would receive Mr. Simpson's invoices from Ms. Blain or Ms. Branch, and was responsible for checking those invoices against Argo. Ms. Hoisington stated that Argo divided the numbers into morning and afternoon deliveries for each territory and how many deliveries should have been made each day. Although Ms. Hoisington was responsible for checking these numbers, she stated that she was extremely busy and just glanced at the invoices for Akron and Summit to make sure there wasn't anything out of the ordinary rather than checking the numbers as she should. After reviewing the invoices, she would either initial the invoices or email them back to Ms. Branch and inform her they were approved. Ms. Hoisington finally testified that she was terminated from KNR "[b]ecause of this situation, because [she] did not do her job and check those areas like [she] should have daily."

{¶22} Detective Zampelli testified that he took Mr. Simpson's initial report of the theft at the Fairlawn Police Department. He stated that Mr. Simpson alleged that he owned a company that delivered advertisements for KNR and that one of his delivery drivers had fabricated numbers of the amounts of deliveries he had made, resulting in a loss of $26,424.00 to

Mr. Simpson's company. Det. Zampelli advised Mr. Simpson that he would need to provide supporting documentation and that Mr. Simpson eventually provided documentation to that effect. Det. Zampelli stated that Mr. Simpson provided EZ Delivery's invoices, DeRemer's handwritten invoices, a series of addresses covering the month of February 2016, and a spreadsheet covering the time period of March 2015 through February 2016 showing what was billed versus what should have been billed.

{¶23} After reviewing Mr. Simpson's documentation, Det. Zampelli stated it appeared very clear to him that there was an obvious inflation of numbers totaling 6,606 deliveries that DeRemer appeared to have been paid for that he did not make. Det. Zampelli then contacted Ms. Tusko, a KNR employee, in an effort to determine if they reviewed any other drivers' records and if the problem was consistent with other drivers. He also reached out to DeRemer and DeRemer agreed to meet with him. DeRemer maintained that he did not falsify any records and that he did not owe Mr. Simpson any money. Instead, DeRemer blamed the computer system at KNR.

{¶24} Ms. Tusko testified that she is the Intake Manager at KNR and manages the intake team, the data team, the receptionist, and the case coordinators. She stated that she was Ms. Hoisington's supervisor and that Ms. Hoisington was responsible for reviewing the invoices submitted by EZ Delivery, but was terminated for not doing so. She stated that she first discovered that Ms. Hoisington was not reviewing the invoices in March 2016 when somebody brought an invoice to her with a question. She further stated that she could see just on the face of the invoice that there could be a potential issue. Specifically, she stated that she had previously been responsible for reviewing the invoices and that the numbers seemed inflated and the total dollar amount seemed higher than what she had normally seen. As a result, she decided to "spot

check" a few of the numbers and compare them to the addresses submitted for those days and discovered discrepancies. Consequently, she decided to "dig a little bit deeper". Once she had compiled all the numbers in an Excel spreadsheet, she immediately took it to Rob Nestico, the managing partner.

{¶25} Ms. Tusko testified that following an audit of EZ Delivery invoices, she concluded that EZ Delivery's numbers were inflated for the Akron and Summit County territories. In making that conclusion, Ms. Tusko stated she went through each date of service and compared each of the addresses on the routes to the actual number that was submitted for a particular morning or afternoon's delivery. If they did not match, she would mark it accordingly and put the information into a spreadsheet. Using this method, Ms. Tusko determined that for March 2015, 44 morning deliveries and 156 afternoon deliveries, for a total of 200 deliveries were overbilled for the Summit County territory. Accordingly, Ms. Tusko concluded that the driver overbilled EZ Delivery $800.00 and in turn, EZ Delivery overbilled KNR a total of $1,312.00. Ms. Tusko stated that she continued this process for every subsequent month until February 2016. She further determined based on the spreadsheets that in 2015, 141 bags were overbilled for the Summit County territory in April, 187 in May, 235 in June, 178 in July, 176 in August, 132 in September, 226 in October, 186 in November, and 214 in December. Ms. Tusko also determined that in 2016, 212 bags were overbilled in January and 187 bags were overbilled in February for the Summit County territory. Based on these numbers, Ms. Tusko concluded that a total of 2,274 deliveries were overbilled for the Summit County territory, resulting in DeRemer overbilling EZ Delivery $9,096.00 and in turn, EZ Delivery overbilling KNR $14,730.00.

{¶26} Ms. Tusko repeated the same process for the Akron territory determining that in 2015, 96 bags were overbilled for the Akron territory in March, 264 in April, 238 in May, 388 in

June, 332 in July, 411 in August, 385 in September, 424 in October, 341 in November, and 579 in December. She further determined that in 2016, 410 bags were overbilled in January and 459 in February. The total bags Ms. Tusko determined had been overbilled in the Akron territory amounted to 4,327, resulting in DeRemer overbilling EZ Delivery in the amount of $17,308.00, and in turn, EZ Delivery overbilling KNR by a total of $27,793.00.

{¶27} Ms. Tusko stated that she created these reports in order to determine "how much of an inflation in dollar value and how many total red bags were overbilled." The State admitted as evidence the documents Ms. Tusko generated as a result of her audit conducted in March 2016. Ms. Tusko stated she was able to compile all of these numbers because everything was saved to the KNR server.

{¶28} Ms. Tusko stated that following the audit, she gave all of the information to Mr. Nestico and that she believed Mr. Nestico reviewed them with Mr. Simpson. Ms. Tusko further stated that Mr. Simpson or EZ Delivery paid back to KNR the amount EZ Delivery had overbilled KNR. She also stated that EZ Delivery is still working for KNR and KNR has had no further issues with EZ Delivery.

{¶29} Viewing this evidence in a light most favorable to the prosecution, we conclude that the State presented sufficient evidence to allow a rational trier of fact to find that DeRemer had committed the crime of grand theft by deception, and that the value of the property or services stolen was between $7,500.00 and $150,000.00, beyond a reasonable doubt. DeRemer was responsible for sending an invoice to EZ Delivery every two weeks stating the number of deliveries he made. Mr. Simpson then presented KNR with an invoice using DeRemer's exact numbers. However, when the numbers on DeRemer invoices were compared to the routes created through the Route4Me app, none of the numbers matched. Indeed, a review of these

documents shows DeRemer's invoices claimed he delivered 6,606 more bags than the number of addresses listed on his routes. Accordingly, DeRemer overbilled EZ Delivery by $26,424.00 and, consequently, EZ Delivery overbilled KNR by over $43,000.00.

{¶30} Therefore, DeRemer's first assignment of error is overruled.

## Assignment of Error II

**Mr. DeRemer's convictions are against the manifest weight of the evidence.**

{¶31} In his second assignment of error, DeRemer contends that his convictions are against the manifest weight of the evidence because there was no evidence that DeRemer attempted to deprive anyone of any property or service by deception since "all the evidence indicates that it was actually the poor record keeping of Mr. Simpson that caused the discrepancy in the financial and billing records in this case." We disagree.

{¶32} To determine whether a criminal conviction is against the manifest weight of the evidence, we "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Nonetheless, "[a]n appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases." *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340.

{¶33} In this case, both Mr. Simpson and Ms. Blain admitted that they did not check DeRemer's delivery numbers before submitting them to KNR for payment. Additionally, Ms. Tusko testified that although it was her responsibility to check EZ Delivery's invoices for accuracy, she did not do so. However, based on this evidence and the testimony outlined above, we cannot say that the jury lost its way in this matter. *See Thompkins*, 78 Ohio St.3d at 387; *Otten*, 33 Ohio App.3d at 340. Both Mr. Simpson and Ms. Blain testified that the numbers they reported on the EZ Delivery invoices were the exact numbers DeRemer submitted to Ms. Blain. Additionally, the State submitted as evidence the text message images DeRemer sent to Ms. Blain showing the number of deliveries DeRemer stated he had delivered during the relevant two week period. "This Court has repeatedly held that the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15. "[T]he jury is free to believe all, part, or none of the testimony of each witness.'" *State v. Clark*, 9th Dist. Wayne No. 14AP0002, 2015-Ohio-2978, ¶ 24, quoting *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35. Moreover, "[a] verdict is not against the manifest weight of the evidence because the finder of fact chooses to believe the State's witnesses rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16.

{¶34} Therefore, DeRemer's second assignment of error is overruled.

### Assignment of Error III

**The trial court committed reversible error when it admitted exhibits that had been recreated a year after the actual events had taken place.**

{¶35} In his third assignment of error, DeRemer contends that the trial court erred by allowing the State to admit as evidence records of DeRemer's daily routes as established by the

Route4Me app and the audit reports created by Ms. Tusko because they were "compilations and summaries" and violated the best evidence rule. We disagree.

**{¶36}** The first documents DeRemer argues were improperly admitted are copies of DeRemer's daily routes as established by the Route4Me app. Specifically, DeRemer argues that there was no evidence that the documents showing DeRemer's daily routes were produced by the same impression as the original and that they could not be substantiated as being an accurate reproduction of the original because there was no evidence of handwritten addresses that may have been added.

**{¶37}** Evid.R. 803(6) governs the admissibility of business records. With regard to this rule, the Supreme Court of Ohio has expounded the following:

> To qualify for admission under Rule 803(6), a business record must manifest four essential elements: (i) the record must be one regularly recorded in a regularly conducted activity; (ii) it must have been entered by a person with knowledge of the act, event or condition; (iii) it must have been recorded at or near the time of the transaction; and (iv) a foundation must be laid by the "custodian" of the record or by some "other qualified witness."

*State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 171, quoting Weissenberger, *Ohio Evidence Treatise* 600, Section 803.73 (2007). "A trial court has broad discretion to admit a business record into evidence pursuant to Evid.R. 803(6), and an appellate court will not disturb a trial court's decision unless the trial court has abused its discretion." *State v. Baker*, 9th Dist. Summit No. 21414, 2003-Ohio-4637, ¶ 9.

**{¶38}** The best evidence rule, however, provides that '[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in [the Ohio Rules of Evidence] or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio." Evid. R. 1002. "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as

to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Evid.R. 1003.

{¶39} As discussed above, Scott Ruhl testified that he is the Lead Data Specialist at KNR and that he prepared the routes for the couriers. Mr. Ruhl specifically testified that he would prepare DeRemer's routes by uploading the spreadsheet created by Argo to Route4Me and then emailing the optimized route to DeRemer. Mr. Ruhl would then copy and paste the route into a Word document and save a timestamped copy. The State admitted as evidence copies of the Word documents Mr. Ruhl saved of DeRemer's daily routes as established by the Route4Me app. Mr. Ruhl stated he did not alter the copies, except to add the information from the timestamp. Additionally, DeRemer's trial counsel stated that prior to trial he received copies of DeRemer's daily Route4Me routes both with and without the date and time added.

{¶40} Concerning the occasional handwritten address on DeRemer's daily routes, Ms. Blain testified that when DeRemer would leave bags from his morning route to be added to his afternoon route, Ms. Blain would send the address to KNR to be included in the afternoon route. However, if that address was left out of the afternoon route, Ms. Blain would handwrite the undelivered morning address into DeRemer's afternoon route where the undelivered morning delivery should be made to promote efficiency. Therefore, any handwritten addresses on DeRemer's afternoon route were previously included in his morning route for that particular day. Ms. Blain stated she did this less than twenty times in the year and a half she was assembling the deliveries for EZ Delivery.

{¶41} Accordingly, we conclude that the trial court did not abuse its discretion by admitting as evidence copies of DeRemer's daily routes as established by the Route4Me app.

{¶42} The second documents DeRemer argues were improperly admitted are Ms. Tusko's audit reports. DeRemer argues that these documents should not have been admitted because they are compilations and summaries. Pursuant to Evid.R. 1006, "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation" under the condition that the original or duplicates are made available for examination or copying by the other party at a reasonable time and place. In this case, however, the audit reports created by Ms. Tusko and admitted at trial consisted of information taken from DeRemer's daily Route4Me routes, EZ Delivery's invoices submitted to KNR for payment, and a calculation of value based on DeRemer's daily Route4Me routes. Indeed, Ms. Tusko specifically testified that conducting the audit, she went through each date of service and compared each of the addresses on the routes to the actual number that was submitted on EZ Delivery's invoice for a particular morning or afternoon's delivery.

{¶43} At trial, EZ Delivery's invoices were admitted without objection and several witnesses testified that KNR paid EZ Delivery $5 for every bag delivered in the morning and $7 per bag delivered in the afternoon. We have also determined that the trial court did not abuse its discretion in admitting DeRemer's daily Route4Me routes. Accordingly, all of the information contained and summarized within the audit reports is also available in other parts of the record from the information's original source. DeRemer's trial counsel acknowledged that he had received all of the above information during discovery.

{¶44} Therefore, DeRemer's third assignment of error is overruled.

### Assignment of Error IV

**Trial court committed reversible error and violated Mr. DeRemer's rights to due process when it sentenced him in violation of Crim.R. 25(B).**

**{¶45}** In his fourth assignment of error, DeRemer contends that the trial court erred and violated his due process rights when it sentenced him in violation of Crim.R. 25(B).

**{¶46}** We review a trial court's application and effect of a Rule of Criminal Procedure de novo. *State v. South*, 162 Ohio App.3d 123, 2005-Ohio-2152, ¶ 9 (9th Dist.).

**{¶47}** Crim.R. 25(B) states as follows:

> After verdict or finding of guilt. If for any reason the judge before whom the defendant has been tried is unable to perform the duties of the court after a verdict or finding of guilt, another judge designated by the administrative judge, or, in the case of a single-judge division, by the Chief Justice of the Supreme Court of Ohio, may perform those duties. If such other judge is satisfied that he cannot perform those duties because he did not preside at the trial, he may in his discretion grant a new trial.

"This rule inferentially commands that unless unable to do so, the judge who presided at a criminal trial must also preside at post-conviction proceedings, including sentencing." *Beatty v. Alston*, 43 Ohio St.2d 126, 127 (1975). "The rule does not favor sentencing by judges unfamiliar with the defendant and the facts of the case against him." *State v. Roper*, 9th Dist. Summit No. 23454, 2008-Ohio-1053, ¶ 15, citing *Beatty* at 127.

**{¶48}** In this case, a visiting judge was appointed by assignment from the Chief Justice of the Ohio Supreme Court to be a visiting judge from February 6, 2017, until February 10, 2017, for the Summit County Common Pleas Court, General Division, "and to conclude any proceedings in which he participated that are pending at the end of that period." DeRemer's jury trial began on February 6, 2017 and concluded on February 10, 2017, when the jury returned a guilty verdict. However, following a presentence investigation, DeRemer's sentencing hearing occurred before the duly-elected judge rather than the visiting judge. DeRemer objected to the duly-elected judge issuing his sentence "on the basis of jurisdiction and also the fact that [the judge] didn't actually hear the trial." In response, the prosecutor stated that he did not believe it

was a proper objection and that it "happens all the time in Summit County[.]" Although the duly-elected judge did not expressly address DeRemer's arguments, the judge later stated that she had "jurisdiction to sentence in this matter;" but would schedule the restitution hearing before the visiting judge if DeRemer desired. The duly-elected judge thereafter sentenced DeRemer and scheduled a restitution hearing before the visiting judge.[1] Nonetheless, the duly-elected judge did not state, and the record does not show, that the judge before whom DeRemer was tried was unable to perform his duties and that the duly-elected judge was then designated by the administrative judge to perform the duties of the court due to that inability. *See* Crim.R. 25(B); *Beatty* at 127.

{¶49} On appeal, the State argues that even if the trial court did not comply with Crim.R. 25(B), the judge before whom DeRemer was tried later conducted the restitution hearing and issued the final judgment of conviction containing DeRemer's sentence and an order for restitution. However, a review of the restitution hearing shows that DeRemer renewed all of his prior objections and the visiting judge did not consider the Crim.R. 25(B) issue. Additionally, a sentencing hearing was not part of the restitution hearing and the visiting judge merely deferred to the duly-elected judge's sentence when he issued the final judgment of conviction containing the sentence and restitution order.

{¶50} Therefore, DeRemer's fourth assignment of error is sustained and we remand this matter for resentencing in compliance with Crim.R. 25(B). *See State v. Lewis*, 2d Dist. Montgomery No. 18735, 2001 Ohio App. LEXIS 4094, 11-12 (2001).

---

[1] Prior to the restitution hearing, DeRemer filed a notice of appeal. This Court dismissed that appeal, determining that the sentencing order was not a final and appealable order because the trial court imposed restitution as part of the sentence, but did not specify the amount of restitution in that order. *See State v. DeRemer*, 9th Dist. No. 28585, May 3, 2017.

**Assignment of Error V**

**The cumulative effect of the trial court's errors denied Mr. DeRemer a fair trial.**

**{¶51}** In his fifth assignment of error, DeRemer contends that even if this Court concludes that the trial court committed harmless errors in the above assignments of error, then the cumulative error doctrine should apply. However, as indicated by our resolution of the previous assignments of error, DeRemer has not identified multiple errors. As such, the cumulative error doctrine does not apply and does not support the reversal of DeRemer's convictions. *See State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 132 ("[T]he doctrine of cumulative error is not applicable to the present case, because there were no multiple errors.") Therefore, we overrule DeRemer's fifth assignment of error.

III.

**{¶52}** DeRemer's first, second, third, and fifth assignments of error are overruled. DeRemer's fourth assignment of error is sustained. Therefore, the judgment of the Summit County Court of Common Pleas is affirmed in part and reversed in part.

Judgment affirmed in part
and reversed in part.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the

period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JULIE A. SCHAFER
FOR THE COURT

TEODOSIO, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

NEIL P. AGARWAL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.